**Petition on Behalf of Concerned Service Provider**
Drafted and Submitted by Ashu Shukla
*Princeton, New Jersey*
ashu.shukla@gmail.com
T # +1-917-488-6143

*** Filed ***
11:47 PM, 01 Jun, 2026
U.S.D.C. Eastern District of New York

**Date: 06/01/2026**

**VIA ECF**

**To,**

**Hon. Nicholas Garaufis,**
United States District Court,
Eastern District of New York,
225 Cadman Plaza East,
Brooklyn, New York 11201

**Copy**:
All Counsel of Record (via ECF)
US Department of Justice

**Case**: **United States v. Adani**, et al, 24-cr-0433-NGG (EDNY)

**Re**: **Letter Motion Requesting Leave from Court to file Motion to Intervene within 14-days**

**Respected Judge Garaufis,**

My name is Mr. Ashu Shukla, and I am submitting this Petition on behalf of Mr. Upendra who provides plumbing services in the city of Bhopal, India.

The following should be read as statements by Mr. Upendra as indicated or stated in First Person. Inferences and explanations were added from Point# 9 onwards to make them relevant:

1. Between December 2025 and June 1st 2026, Indian female state actors reached out to me multiple times such that I delay or deny my plumbing services to Mr. Shukla at his construction site in Bhopal, M.P, India.

2. During this time, Mr. Shukla reached out to me repeatedly asking for services. However, Indian female state actors asked me to intentionally delay matters or deny completion of work within a specific time.

3. Specifically, Mr. Shukla reached out to me via Phone on dates: 06/01/2026, 05/30/2026, 05/22/2026, 02/18/2026, 02/17/2026, 02/14/2026, 02/13/2026, 02/12/2026, 02/07/2026, 02/04/2026, 01/31/2026 sending reminders or requesting for services on my Phone number +91-90***-***39.

4. Specifically, Mr. Shukla reached out to me via Whatsapp on dates: 06/01/2026, 05/31/2026, 05/30/2026, 05/26/2026, 05/22/2026, 05/20/2026, 05/17/2026, 04/11/2026, 04/10/2026, 04/08/2026, 04/07/2026, 02/26/2026, 02/24/2026, 02/21/2026, 02/20/2026, 02/18/2026, 02/14/2026, 02/13/2026, 02/12/2026, 02/11/2026, 02/09/2026, 02/08/2026, 02/05/2026, 02/04/2026, 01/27/2026, 01/25/2026, 01/21/2026, 01/18/2026 sending reminders or requesting for services on my Whatsapp number +91-90***-***39.

5. Specifically, I was repeatedly asked by Indian female state actors to delay or deny services from mid-February 2026 onwards.

6. These Indian female state actors have reached out to me via various means of communications including Phone.

7. Indian female state actors claim to help and support the US Department of Justice.

8. As a concerned Indian, I believe that the <u>United States</u> has <u>no business to impose sanctions</u> on Oil or Natural Gas, and Court must <u>not allow</u> Mr. Adani to Pay $275 Million to US Treasury. The matter is similar to Indian female state actors acting under their own interests and/or under the influence of US agencies, asking me to maintain double standards against Mr. Shukla.

9. Specifically, it is known that United States ally Israel helps the United States facilitate the "Petro-dollar", and helps the United States maintain financial leverage and financial dominance in the Middle East.

10. Since US ally Israel has continued to bomb Gaza and Lebanon in order to exert their influence or dominance in the Middle East, under the obvious supervision and protection of the United States, I believe that the United States cannot maintain double standards and impose sanctions on Essential Global Commodities such as Oil or Natural Gas.

11. Oil Prices are up because Israel supported by the United States continues to bomb Lebanon. Iran has repeated identified that a deal or agreement with the United States cannot be reached as Israel continues to bomb Lebanon. US has support such Israel actions for years.

12. The fact of the matter is that the United States has neither offered any help nor provided any relief to concerned citizens of the World like me. In fact, co-collaborator on the Adani matter, the Indian Government, has chosen to increase oil prices only after a settlement was proposed on these matters (on or around May 14th 2026). The wait itself has caused Indian Taxpayers to lose tens of Billions of dollars.

13. Think of it this way, the action is similar to US DOJ maintaining double standards against Mr. Shukla, where first US DOJ intentionally retaliates against Mr. Shukla through one or more frivolous court filings to cover the fraud by US deepstate and Indian female state actors, and then asks service providers like me to further retaliate against Mr. Shukla to intentionally or wantonly delay or deny services for their own benefit.

14. Moreover, since the United States has continued to support "reckless actions" of an ally during the same or similar period of time as identified on this matter, the situation does not allow the United States to make a '*valid court claim*' or secure a '*valid court settlement*' under "*reckless action*" clause (be it at US Treasury or US Judiciary). [See **Exhibit B**]

15. Mr. Shukla is a Whistleblower on such matters. Though I am myself ashamed of collaborating with Indian female state actors, who exert their influence via undue Police

involvement, illegal occupation of properties, financial fraud, etc., I feel equally ashamed of asking Mr. Shukla to provide me estimated Rs. 40,000 as unpaid balance for the services I have partially completed, and I have reasons to believe that Indian female state actors must pay this unpaid balance.

16. In any case, when the United States itself has maintained double standards, there is no reason for the United States to benefit or profit $275 Million on this matter. Such $275 Million must be provided as relief to Indian Citizens.

17. The Court must note that the US Treasury is an essential and integral part of the United States Government.

Thus, the court must grant me leave of Court such that I can request the US Court to direct Indian State actors to pay me Indian (INR) Rs. 40,000, and such that if the Court chooses to entertain the so identified settlement agreement between the parties United States and Adani, I may request the US Court to direct $275 Million in settlement amount back to India or Indian Citizens.

Wherefore, I hereby request the court to enter an order to:

1. Grant me Leave of Court so I could file a Motion to Intervene on the matter
2. Grant me any other and further relief that the court deems just and equitable

**Date: 06/01/2026**

**Petition on Behalf of Concerned Service Provider Mr. Upendra**
**Drafted and Submitted by Ashu Shukla**
202 Salem Ct, Apt# 11,
Princeton, NJ 08540
ashu.shukla@gmail.com
T # +1-917-488-6143



# EXHIBIT B


**DEPARTMENT OF THE TREASURY**
OFFICE OF FOREIGN ASSETS CONTROL


**Enforcement Release: May 18, 2026**

## Adani Enterprises Limited Settles with OFAC for $275,000,000 Related to Apparent Violations of Iran-related Sanctions

Adani Enterprises Limited (AEL), a diversified multinational company headquartered in India, has agreed to pay $275,000,000 to settle its potential civil liability for apparent violations of OFAC sanctions on Iran. From November 2023 to June 2025, AEL purchased shipments of liquified petroleum gas (LPG) from a Dubai-based trader purporting to supply Omani and Iraqi gas. Red flags should have put AEL on notice that the LPG actually originated from Iran. During this time period, AEL caused U.S. financial institutions to process 32 U.S. dollar (USD) denominated payments totaling approximately $192,104,044 for the shipments. The settlement amount reflects OFAC's determination that AEL's apparent violations were egregious and not voluntarily self-disclosed and further reflects the AEL's remedial measures following discovery of the conduct and the cooperation AEL provided for OFAC's investigation.

### Description of the Apparent Violations

In June 2023, AEL entered the liquified petroleum gas (LPG)[1] market by importing LPG and selling to customers in India.[2] Adani Ports and Special Economic Zone Ltd. (APSEZ) operates Mundra Port in Gujarat, on India's western coast. However, neither AEL nor any of its affiliates had, prior to this time, traded LPG on their own account through Mundra Port.

At the time, given the competition from established LPG importers in the Indian market, AEL needed a discounted source of LPG. In July 2023, representatives of AEL, including the head of its newly formed LPG unit (the "LPG Head"), met with representatives of a Dubai-based trading company (the "Dubai Supplier") involved in supplying purportedly Omani-origin LPG to another Indian entity.[3] In September 2023, the Dubai Supplier informed AEL that it would be able to provide the company with LPG through an affiliated entity. A contemporaneous internal AEL document describes the Dubai Supplier as providing "discounted LPG from Middle East" on a spot basis. The Dubai Supplier operated through a number of different affiliated entities. At the time, AEL relied on APSEZ's 2020 OFAC sanctions compliance program, which prohibited Iranian and/or sanctioned vessels and Iranian-origin cargo from entering APSEZ-controlled ports. AEL conducted its standard Know Your Customer verification process on the Dubai Supplier and its affiliates involved in LPG sales to AEL, which identified no hits against OFAC's List of Specially Designated Nationals (SDN) and Blocked Persons (the "SDN List").

---

[1] LPG is typically a mixture of propane and butane, though cargos may be composed entirely of one product type.

[2] A significant increase in LNG prices resulting from the Russian invasion of Ukraine made LPG more attractive to consumers in certain markets, including India and Bangladesh, where substitution was possible.

[3] AEL was introduced to the Dubai Supplier by an individual affiliated with an entity designated subsequently in December 2025 pursuant to E.O. 13902 for operating in the petroleum sector of the Iranian economy.

While the Dubai Supplier represented itself as a reputable middleman supplying LPG primarily from Oman, as well as Iraq, in reality the company served as a conduit for illicit Iranian supply to enter the market.  Indeed, an affiliate of the Dubai Supplier had been designated by OFAC in March 2023 pursuant to E.O. 13846 for purchasing LPG from Iran-based SDN Persian Gulf Petrochemical Industries for resale.  It does not appear that AEL was aware of the designation at the time.

*AEL's Purchases from Dubai Supplier*

Following discussions regarding pricing and timing of the shipment, AEL completed its first purchase from the Dubai Supplier in November 2023, with a cargo of fully refrigerated propane shipped on a 25-year old Handysize LPG tanker.[4]  Shipping documents associated with the transaction identify the cargo's origin as Sohar, Oman.  AEL paid $5,672,024 for the shipment. AEL would go on to purchase 34 additional cargos of Iranian-origin LPG from the Dubai Supplier or its affiliates.  As they did for all LPG imports, AEL and APSEZ reviewed Know Your Customer documentation, reviewed shipping documentation and vessel port of calls lists, and checked vessels, vessel operators, and LPG sellers against the SDN List.  None of the parties involved in AEL's LPG imports were sanctioned at the time of the LPG shipments, and none of the documentation provided to AEL contained any information explicitly pointing to Iranian origin of the LPG.  However, AEL and APSEZ's sanctions compliance program did not include other measures to account for risks arising from its dealings, as described below.

Payments for these shipments were generally made in USD or AED from accounts at UAE or Indian banks on a collection basis, against documents sent by the relevant suppliers through banking channels.  In total, U.S. financial institutions processed $192,104,044 in payments for 32 shipments of Iranian-origin LPG purchased by AEL from the Dubai Supplier or its affiliates.  Payments for the three remaining shipments of Iranian-origin LPG were either never completed or were conducted entirely in AED.

*AEL Overlooked Red Flags That Should Have Prompted Additional Investigation*

From the earliest days of the relationship, a number of red flags called into question the true source of the Dubai Supplier's cargo.  On at least four separate occasions between March 2023 and February 2024, AEL learned of third-party concerns that cargos supplied by the Dubai Supplier may have originated in Iran.  For instance, in March and April 2023, prior to AEL's entering the LPG market, APSEZ and the LPG Head received inquiries from an Indian state-owned entity alleging that a specific vessel would be coming into Mundra carrying Iranian-origin LPG imported by a third party.  The LPG Head was aware at the time that the purchaser of the cargo was a customer of the Dubai Supplier and that the Dubai supplier used the vessel to carry purportedly Omani-origin LPG. The vessel was accepted at Mundra after checking shipping documentation and confirming that such documentation did not reflect an explicit Iranian nexus.  AEL would later purchase two cargos, later discovered to be of Iranian-origin LPG, from the Dubai Supplier that were shipped on the same vessel.  Moreover, for the entire period in which the Apparent Violations occurred, vessels carrying

---

[4] Handysize vessels are typically capable of carrying between 15,000 and 25,000 cbm of gas.  Because larger vessels benefit from economies of scale and are more fuel-efficient, it is more expensive on a cost per metric ton basis to carry cargo on a handysize tanker compared to a very large gas carrier (VLGC).

the Dubai Supplier's cargos routinely engaged in suspicious behavior, including (1) Automatic Identification System (AIS)[5] manipulation, such as spoofing and prolonged unexplained AIS dark periods; (2) uneconomic or illogical vessel movements or port calls; and (3) frequent name, ownership, and flag state change.

Indeed, as early as AEL's first shipment, signs were present that the cargos did not originate from the jurisdictions identified in the certificates of origin. The November 2023 shipment of fully refrigerated propane was identified as being loaded in Sohar, Oman. Yet, Sohar is not a significant source of Omani LPG exports, which originate primarily from Salalah, Oman. Furthermore, facilities for exporting fully-refrigerated LPG did not exist at Sohar at the time.[6] Transaction documentation provided by the Dubai Supplier also bore indica of falsification, including: (1) illogical and nonsequential numbering of certificates of origin, (2) repeated unexplained delays in post-shipment issuance of documents, and (3) use of outdated document templates. It does not appear that AEL took sufficient action in response to any of these red flags while the Apparent Violations were ongoing.

Another red flag was the price of the Dubai Supplier's cargo. Iran, virtually alone among Middle Eastern sources of LPG, offered significantly discounted LPG. The prices AEL received from the Dubai Supplier were sufficiently below the predominant market rate that, at a minimum, AEL should have exercised a greater degree of scrutiny in confirming the source of its LPG, all the more so given that the LPG was allegedly sourced from jurisdictions neighboring Iran. Given the (1) claimed origin of the cargos supplied by the Dubai Supplier, (2) expected freight costs for shipments carried on vessels chartered by the Dubai Supplier, and (3) reasonable estimates for associated port fees and profit margins, the prices offered by the Dubai Supplier do not appear to have been commercially reasonable.

Furthermore, on at least one occasion, payments owed to the Dubai Supplier appear to have been stopped due to sanctions concerns. In February 2024, the Dubai Supplier's bank stopped payment for one of the shipments due to "internal policy," though the bank does not appear to have specifically referenced U.S. sanctions concerns. The Dubai Supplier then directed AEL to make payment via a new account at another Dubai-based bank and to contact specific employees at a specific branch of the new bank. In February 2024, the Dubai Supplier's bank stopped payment for the shipment, raising concerns about whether the purportedly Omani cargo originated in Iraq or Iran. The bank eventually allowed the payment to proceed after the Dubai Supplier provided additional, apparently falsified shipping documentation.

For its part, AEL does not appear to have taken sufficient steps to investigate these red flags beyond reviewing shipping documentation and obtaining assurance from the Dubai Supplier that it was not selling Iranian-origin LPG after receipt of some of the third-party allegations. AEL appears to have believed that the allegations originated from competitors seeking to prevent it from entering the

---

[5] AIS is shipboard broadcast system that acts like a transponder, providing information such as ship name, position, course and speed, classification, call sign, registration number, MMSI, and other information.

[6] Because cryogenic storage tanks and associated loading infrastructure did not exist at Sohar Port, the cargo would need to have originated either (1) outside of Oman or (2) have been loaded as a semi-refrigerated cargo and cooled to fully refrigerated while the vessel was in transit, significantly increasing fuel burn and overall shipping costs.

LPG market and that if the shipping documents were valid on their face, no additional inquiry was required.

*Suspension of LPG Imports and Investigation*

Following public reports in June 2025 of allegations that AEL was engaged in the importation of Iranian-origin LPG, AEL immediately suspended all LPG imports and engaged U.S.-based counsel to conduct a comprehensive investigation of the company's LPG business. AEL extensively cooperated with OFAC's investigation, including by proactively disclosing the findings of its investigation, producing large volumes of documentation, meaningfully answering all the agency's questions, and promptly resolving its potential liability. Additionally, AEL implemented extensive enhancements to its sanctions compliance program that apply across AEL's corporate group.

*Summary of Apparent Violations*

Accordingly, this conduct resulted in 32 apparent violations (the "Apparent Violations") of § 560.203(a) of the Iranian Transactions and Sanctions Regulations (ITSR), 31 C.F.R. part 560, by causing U.S. financial institutions to facilitate certain trade-related transactions involving goods of Iranian origin, in violation of § 560.206 of the ITSR. The settlement agreement for this action can be found here.

**Penalty Calculations and General Factors Analysis**

OFAC determined that AEL did not voluntarily self-disclose the Apparent Violations and that the Apparent Violations constitute an egregious case. Accordingly, under OFAC's Economic Sanctions Enforcement Guidelines ("Enforcement Guidelines"), 31 C.F.R. part 501, app. A., the base civil monetary penalty applicable in this matter is the statutory maximum penalty of $384,208,088.

The settlement amount of $275,000,000 reflects OFAC's consideration of the General Factors under the Enforcement Guidelines.

OFAC determined the following to be **aggravating factors**:

(1) AEL acted recklessly and had reason to know of the Apparent Violations due to the presence of red flags pointing to potential links to Iran. These included warnings received from third parties that LPG cargos being imported by AEL may have been of Iranian-origin, and the economic, commercial, and logistical implausibility of the cargos' origin and pricing. AEL also did not conduct additional due diligence that may have revealed that the vessels carrying its LPG cargos routinely engaged in suspicious behavior such as Automatic Identification System manipulation, uneconomic or illogical vessel movements or port calls, and frequent name, ownership, and flag state changes. Furthermore, as recognized in its then-existing sanctions compliance program, the company knew that actions which cause a U.S. person to violate Iran sanctions, such as initiating payments processed by U.S. financial institutions, could expose the company to civil or criminal penalties under U.S. law.

(2) AEL caused substantial harm to sanctions program objectives by contributing to Iran's ability to derive revenue from its energy sector—funds that the regime uses to support its illicit nuclear program, fund its terrorist and proxy groups, and oppress its own people. Restricting Iran's energy exports represents a core objective of U.S. sanctions targeting Iran; AEL's actions were in direct contravention of this purpose and provided substantial economic benefit to accrue to the Iranian government.

(3) AEL is a large and sophisticated international company with multiple business lines, including in the energy and infrastructure sectors.

OFAC determined the following to be **<u>mitigating factors</u>**:

(1) AEL has not received a penalty notice or Finding of Violation from OFAC in the five years preceding the earliest date of the transactions giving rise to the Apparent Violations.

(2) At the time of the shipments, AEL's nascent LPG business was a small percentage of AEL's overall revenue, representing less than 1.5% of AEL's consolidated revenue for 2025.

(3) AEL provided substantial cooperation to OFAC, including by conducting a thorough, independent internal investigation on an expedited basis and at substantial cost, responding promptly to OFAC's requests for information, and providing large volumes of data regarding the Apparent Violations.

(4) AEL has implemented significant remedial measures to respond to the Apparent Violations, including ceasing imports of LPG into India, enhancing its sanctions compliance policy and controls, and implementing certain compliance commitments. AEL has already begun implementing some of these commitments, including the following:

- o Creating and adopting a robust risk-based U.S. sanctions compliance policy and written due diligence protocol overseen by a dedicated Group Head of Compliance;

- o Applying the enhanced sanctions compliance policy across AEL, in order to foster consistency, comprehensiveness, and uniformity in how sanctions-related diligence is conducted across its business units;

- o Incorporating into its sanctions risk assessment consideration of risks relating to maritime transport of hydrocarbons, including risks identified in OFAC's published guidance;

- o Deploying information technology solutions for maritime intelligence specifically designed to mitigate risks in the marine transportation sector.

**Compliance Considerations**

This case highlights the risks and potential costs that non-U.S. companies are exposed to when using the U.S. financial system for transactions that involve the purchase, sale, and maritime

transport of energy products from regions with a high risk of sanctions evasion activity.  Restricting Iran's energy exports has represented a core objective of U.S. sanctions targeting Iran across successive administrations.  OFAC issued guidance in 2019, 2020, 2024, and 2025 specifically identifying the risks presented by Iran's efforts to ship clandestinely petroleum, petroleum products, and petrochemical products, revenues from which it uses to fund its destabilizing activities, including advancing its nuclear weapons and ballistic missile programs and supporting terrorist groups that threaten the national interests of the United States and its allies and partners.

Iran employs sophisticated evasion typologies to circumvent sanctions, particularly with respect to hydrocarbon exports.  Industry participants, especially buyers of energy products and financial institutions facilitating related transactions, should carefully review transaction details for indications that they are dealing in products or cargoes of Iranian origin.  Importers should conduct appropriate due diligence to corroborate the origin of energy products, including taking steps to verify the authenticity of certificates of origin issued by a relevant competent authority, particularly when issued in jurisdictions where certain actors are known to obfuscate Iranian origin, such as Oman, United Arab Emirates, or Iraq.  Importantly, relying solely on counterparty documentation and warranties with respect to cargo origin may be insufficient to mitigate the risk of potential violations of OFAC-administered sanctions regulations.

Energy importers must be familiar with and monitor for typologies associated with Iran's reliance on a shadow fleet of vessels to transport its energy exports.  Indeed, a majority of the vessels involved in the Apparent Violations were later designated by OFAC.  As noted above, OFAC has released extensive guidance, including the 2025 Guidance for Shipping and Maritime Stakeholders on Detecting and Mitigating Iranian Oil Sanctions Evasion, advising industry of the risks of engaging with this shadow fleet and the specific typologies employed in Iran's maritime sanction evasion.  Examples of common shadow fleet activity include non-commercially viable activity like successive STS transfers, deliberate vessel position information manipulation, fraudulent vessel identity claims, use of older, poorly maintained vessels, and nexuses to sanctioned actors or activity through opaque vessel management and ownerships structures, among others.  Energy importers should continuously monitor for new trends in sanctions evasion and proactively adapt compliance protocols to prevent violations.

This case also embodies the adage "if a deal is too good to be true, it probably is."  Buyers of energy products originating from high-risk regions are encouraged to closely scrutinize and deploy enhanced due diligence when presented with proposals offering prices significantly below prevailing market rates.  Additional caution is especially warranted when significantly below-market prices are being offered by entities with limited public profile or trading history, and where multiple affiliated entities are used to conduct similar transactions for unexplained reasons.  Compliance with U.S. sanctions is also not an exercise in box-checking; allegations of involvement by counterparties in sanctions evasion should be swiftly and thoroughly investigated.

Finally, this case demonstrates that even in cases where the threshold for voluntary self-disclosure credit is not met, OFAC is prepared to offer substantial mitigation in the event of prompt disclosure, rapid investigation, and significant cooperation.

**OFAC Enforcement and Compliance Resources**

On May 2, 2019, OFAC published A Framework for OFAC Compliance Commitments in order to provide organizations subject to U.S. jurisdiction, as well as foreign entities that conduct business in or with the United States or U.S. persons, or that use goods or services exported from the United States, with OFAC's perspective on the essential components of a sanctions compliance program. The *Framework* also outlines how OFAC may incorporate these components into its evaluation of apparent violations and resolution of investigations resulting in settlements. The *Framework* includes an appendix that offers a brief analysis of some of the root causes of apparent violations of U.S. economic and trade sanctions programs OFAC has identified during its investigative process.

Information concerning the civil penalties process can be found in the OFAC regulations governing each sanctions program; the Reporting, Procedures, and Penalties Regulations, 31 C.F.R. part 501; and the Economic Sanctions Enforcement Guidelines, 31 C.F.R. part 501, app. A. These references, as well as recent civil penalties and enforcement information, can be found on OFAC's website at https://ofac.treasury.gov/civil-penalties-and-enforcement-information.

**Whistleblower Program**

The U.S. Department of the Treasury's Financial Crimes Enforcement Network (FinCEN) maintains a whistleblower incentive program for violations of OFAC-administered sanctions, in addition to other violations of the International Emergency Economic Powers Act and violations of the Bank Secrecy Act. Individuals located in the United States or abroad who provide information about sanctions violations may be eligible for awards if the information they provide leads to a successful enforcement action that results in monetary penalties exceeding $1,000,000. The incentive program is available for whistleblowers providing information relating to potential violations in any commercial sector.